UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- x

In re:

                            Chapter 11

LYONDELL CHEMICAL COMPANY, *et al.*,

                            Case No: 09-10023(REG)

               Debtors.

----------------------------------------------------------------------- x    Jointly Administered

THE WILMINGTON TRUST COMPANY, solely in its
Capacity as the successor Indenture Trustee for the senior
notes issued by Nell AF S.Á.R.L. under an Indenture, dated       Adv. Pro. No. _____
August 10, 2005,

               Plaintiff,

v.

LYONDELLBASELL INDUSTRIES AF S.C.A.; ABN
AMRO BANK N.V.; ABN AMRO INCORPORATED;
CITIBANK, N.A; CITIBANK, N.A., LONDON BRANCH;
CITIGROUP GLOBAL MARKETS INC; GOLDMAN
SACHS CREDIT PARTNERS L.P.; GOLDMAN SACHS
INTERNATIONAL BANK; GOLDMAN SACHS
LENDING PARTNERS LLC; MERRILL LYNCH
CAPITAL CORPORATION; MERRILL LYNCH
INTERNATIONAL BANK LIMITED F/K/A MERRILL     **<u>COMPLAINT</u>**
LYNCH CAPITAL MARKETS BANK LIMITED;
MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; UBS AG, STAMFORD BRANCH;
UBS LOAN FINANCE LLC; UBS SECURITIES LLC; DZ
BANK AG; ACLF / LYONDELL S.À R.L.; ACLF CO-
INVEST / LYONDELL S.À R.L.; APOLLO
MANAGEMENT VII, L.P.; ARES MANAGEMENT LLC;
AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA
PENSION PLAN; BANC OF AMERICA SECURITIES
LIMITED; BAYERISCHE LANDESBANK; BDF
LIMITED; CATERPILLAR INC. PENSION MASTER
TRUST; CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND; CHRYSLER
LLC MASTER RETIREMENT TRUST; EMPLOYEES'
RETIREMENT FUND OF THE CITY OF DALLAS;

ESPERANCE; FIELD POINT IV S.A.R.L.; FIELD POINT          :
V S.A.R.L.; GENERAL BOARD OF PENSION AND                 :
HEALTH BENEFITS OF THE UNITED METHODIST                  :
CHURCH INC. IN MISSOURI; GMAM INVESTMENT                 :
FUNDS TRUST; GRAND CENTRAL ASSET TRUST,                  :
SIL SERIES; HIGHLAND CAPITAL MANAGEMENT                  :
LP; IBM PERSONAL PENSION PLAN TRUST;                     :
INTERNATIONAL PAPER COMPANY COMMINGLED                   :
INVESTMENT GROUP TRUST; IOWA PUBLIC                      :
EMPLOYEES' RETIREMENT SYSTEM; JASPER                     :
FUNDING; KENSINGTON INTERNATIONAL                        :
LIMITED; KOHLBERG KRAVIS ROBERTS & CO.                   :
(FIXED INCOME) LLC; LERNER ENTERPRISES, LLC;             :
LEVERAGESOURCE III S.À R.L.; LEVERAGESOURCE              :
XI S.À R.L.; LUCENT TECHNOLOGIES INC. MASTER             :
PENSION TRUST; MANCHESTER SECURITIES CORP.;              :
OAK HILL CREDIT PARTNERS V, LIMITED; OAK                 :
HILL EUROPEAN CREDIT PARTNERS I PLC; OAK                 :
HILL EUROPEAN CREDIT PARTNERS II PLC; OCM                :
HIGH YIELD LD HOLDINGS LTD.; OCM LOAN FUND               :
2X LD HOLDINGS LTD.; OCM LOAN FUND LD                    :
HOLDINGS LTD.; OCM OPPORTUNITIES LD                      :
HOLDINGS LTD.; OHA CAPITAL SOLUTIONS                     :
FINANCING (OFFSHORE), LTD.; OHA CAPITAL                  :
SOLUTIONS FINANCING (ONSHORE), LTD.; OHA                 :
FINLANDIA CREDIT FUND; OHA STRATEGIC                     :
CREDIT FUND (PARALLEL I), L.P.; OHA STRATEGIC            :
CREDIT FUND, L.P.; OHA STRATEGIC CREDIT                  :
MASTER FUND (PARALLEL II), L.P.; OHSF                    :
FINANCING, LTD.; OHSF II FINANCING, LTD.;                :
PACIFIC GAS & ELECTRIC COMPANY POST                      :
RETIREMENT MEDICAL PLAN TRUST FOR NON-                   :
MANAGEMENT EMPLOYEES AND RETIREES; PG&E                  :
CORPORATION RETIREMENT MASTER TRUST;                     :
PROMONTORIA HOLDING VI B.V.; SAN DIEGO                   :
COUNTY EMPLOYEES' RETIREMENT                             :
ASSOCIATION; SILVER OAK CAPITAL LLC; SILVER              :
POINT CAPITAL; SILVER POINT LUXEMBOURG                   :
PLATFORM S.A R.L.; SPF CDO I, LTD.; SPRINGFIELD          :
ASSOCIATES, LLC; STICHTING                               :
BEDRIJFSTAKPENSIOENFONDS VOOR DE                         :
METALEKTRO; STICHTING MN SERVICES US HIGH                :
YIELD FONDS; STICHTING PENSIOENFONDS                     :
METAAL EN TECHNIEK; SWIFTCURRENT                         :

OFFSHORE, LTD.; SWIFTCURRENT PARTNERS, L.P.;          :
TEXAS COUNTY & DISTRICT RETIREMENT                    :
SYSTEM; THE STATE TEACHERS RETIREMENT                 :
SYSTEM OF OHIO; TMCT II, LLC; TMCT, LLC; W.R.         :
HUFF ASSET MANAGEMENT CO., L.L.C.; and               :
WESTERN ASSET MANAGEMENT COMPANY,                     :
                                                      :
                              Defendants.             :
                                                      :
---------------------------------------------------------------------- :
                                                      :
                                                      x

Plaintiff Wilmington Trust Company, solely in its capacity as the successor Indenture

Trustee  ("Plaintiff") for owners of 8-3/8% Senior Notes due 2015 (the "Senior Notes", and the

holders of the Senior Notes, herein the "Senior Noteholders") issued pursuant to an Indenture

dated August 10, 2005 (the "Senior Notes Indenture" or "Indenture"), as and for its complaint

against:  (a) Defendant LyondellBasell Industries AF S.C.A.; (b) Defendants ABN AMRO Bank

N.V. and ABN AMRO Incorporated (individually and collectively, "ABN AMRO"); Citibank,

N.A., Citigroup, N.A. London Branch, and Citigroup Global Markets, Inc. (individually and

collectively, "Citigroup"); Goldman Sachs Credit Partners L.P. ("Goldman"); Merrill Lynch

Capital Corporation ("ML Capital"), Merrill Lynch International Bank Limited f/k/a Merrill

Lynch Capital Markets Bank Limited ("ML Bank"), and Merrill Lynch, Pierce, Fenner & Smith

Incorporated ("Merrill Lynch") (individually and collectively "Merrill"); UBS AG, Stamford

Branch, UBS Loan Finance LLC, and UBS Securities LLC (individually and collectively,

"UBS," and with ABN AMRO, Citigroup, Goldman and Merrill, the "Bank Defendants"); and

(c) Defendants ACLF / Lyondell S.À R.L.; ACLF Co-Invest / Lyondell S.À R.L.; Apollo

Management VII, L.P.; Ares Management LLC; Automobile Club Of Southern California

Pension Plan; America Securities Limited; Bayerische Landesbank; BDF Limited; Caterpillar

Inc. Pension Master Trust; Central States, Southeast and Southwest Areas Pension Fund;

Chrysler LLC Master Retirement Trust; Citibank, N.A., London Branch; DZ Bank Ag;

Employees' Retirement Fund Of The City Of Dallas; Esperance; Field Point IV S.A.R.L.; Field

Point V S.A.R.L.; General Board Of Pension And Health Benefits Of The United Methodist

Church Inc. in Missouri; GMAM Investment Funds Trust; Grand Central Asset Trust, SIL

Series; Goldman Sachs International Bank; Goldman Sachs Lending Partners LLC; Highland

Capital Management LP; IBM Personal Pension Plan Trust; International Paper Company

Commingled Investment Group Trust; Iowa Public Employees' Retirement System; Jasper

Funding; Kensington International Limited; Kohlberg Kravis Roberts & Co. (Fixed Income)

LLC; Lerner Enterprises, LLC; Leveragesource III S.À R.L.; Leveragesource XI S.À R.L.;

Lucent Technologies Inc. Master Pension Trust; Manchester Securities Corp.; Oak Hill Credit

Partners V, Limited; Oak Hill European Credit Partners I PLC; Oak Hill European Credit

Partners II PLC; OCM High Yield Ld Holdings Ltd.; OCM Loan Fund 2x Ld Holdings Ltd.;

OCM Loan Fund Ld Holdings Ltd.; OCM Opportunities Ld Holdings Ltd.; OHA Capital

Solutions Financing (Offshore), Ltd.; OHA Capital Solutions Financing (Onshore), Ltd.; OHA

Finlandia Credit Fund OHA Strategic Credit Fund (Parallel I), L.P.; OHA Strategic Credit Fund,

L.P.; OHA Strategic Credit Master Fund (Parallel II), L.P.; OHSF Financing, Ltd.; OHSF II

Financing, Ltd.; Pacific Gas & Electric Company Post Retirement Medical Plan Trust for Non-

Management Employees and Retirees; PG&E Corporation Retirement Master Trust;

Promontoria Holding VI B.V.; San Diego County Employees' Retirement Association; Silver

Oak Capital LLC; Silver Point Capital; Silver Point Luxembourg Platform S.A R.L.; SPF CDO I,

Ltd.; Springfield Associates, LLC; Stichting Bedrijfstakpensioenfonds Voor De Metalektro;

Stichting Mn Services Us High Yield Fonds; Stichting Pensioenfonds Metaal En Techniek;

Swiftcurrent Offshore, Ltd.; Swiftcurrent Partners, L.P.; Texas County & District Retirement

System; The State Teachers Retirement System Of Ohio; TMCT II, LLC; TMCT, LLC; W.R.

Huff Asset Management Co., L.L.C.; and Western Asset Management Company (collectively,

the "Successor Defendants," and with the Bank Defendants, the "Defendants"), alleges as

follows:

### PRELIMINARY STATEMENT

1.      This declaratory judgment, breach of contract, and equitable subordination action

arises out of the numerous breaches of the Senior Notes Indenture and a related intercreditor

agreement that resulted from the massive and fundamentally untenable debt package structured

by the Bank Defendants in December 2007 (the "LBO Debt") in connection with the leveraged

acquisition (the "LBO") of Lyondell Chemical Company ("Lyondell") by Basell AF S.C.A., a

Luxembourg entity, since renamed LyondellBasell Industries AF S.C.A. (prior to its acquisition

of Lyondell, "Basell," and thereafter, "LBI").  The Lyondell acquisition was orchestrated by

Leonard Blavatnik ("Blavatnik") through Access Industries Holding, LLC ("Access") – the

controlling shareholder of Basell and, by means of an affiliate, a significant shareholder in

Lyondell – and the Bank Defendants for their own enrichment, without regard to the extreme

risks the transaction foisted upon others.  Indeed, Access contributed no equity to the Lyondell

acquisition, and made over $330 million when its affiliate's Lyondell shares were sold as part of

the LBO.  Moreover, the Bank Defendants made hundreds of millions in fees, all while

structuring the entire acquisition so that its considerable risks were transferred intentionally to,

among others, the Senior Noteholders.

2.     The LBO Debt, which was over $20 billion and increased the aggregate debt of

Basell by over $18 billion (and the aggregate debt of Lyondell and Basell on a combined basis

by approximately $14 billion), provided no real benefit to either the purchasing or "bought out"

company.  Not surprisingly, the burdens of the LBO Debt proved too much, and within 13

months of the LBO several LBI affiliates (all of which were obligors on the LBO Debt) filed for

bankruptcy protection.  Three months after the LBI affiliates' initial bankruptcy filings, LBI was

itself dragged into these bankruptcy proceedings (LBI and its bankrupt affiliates, collectively, the

"Debtors").

3.     Before the Lyondell acquisition, Basell was a solvent, profitable company with no

defaults on its €3.1 billion of outstanding debt, including the Senior Notes.  In addition, the

Senior Noteholders were protected from any reckless incurrence of new indebtedness by the

Senior Notes Indenture and an Intercreditor Agreement dated August 1, 2005 (the "2005

Intercreditor Agreement"), both entered into in connection with the August 2005 issuance of the

Senior Notes.  The Senior Notes Indenture, among other things, strictly limited senior

indebtedness that could be incurred by Basell and its subsidiaries, and the liens that could be

granted therefor.  In addition, the 2005 Intercreditor Agreement, to which certain of the Bank

Defendants were parties, dictated, among other things, express conditions precedent for

refinancings of Basell's bank debt.  One of those conditions was that any refinancing could not

be on terms that would result in a breach of the Senior Notes Indenture or the 2005 Intercreditor

Agreement, among other agreements.

4.     The Official Committee of Unsecured Creditors of the Debtors (the "Committee")

has, through an adversary proceeding (Adv. Pro. No. 09-10023(REG) (the "Committee

Action")), attacked the LBO and its participants, alleging, among other things, that the LBO constituted a fraudulent conveyance and that certain LBO participants breached, or aided and abetted the breach of, fiduciary duties.  The Committee also alleges that the LBO participants knew the LBO was doomed yet forged ahead, recklessly disregarding the impact on the combined companies and, in particular, their pre-existing creditors.

5.      The Committee Action basically looks to applicable law and argues that the LBO should not have been consummated and its effects should now be unwound.  However, the LBO should and could not have been consummated for another reason that is unique to the Senior Noteholders – it was prohibited by the Senior Notes Indenture and the 2005 Intercreditor Agreement.

6.      The LBO violated the Senior Notes Indenture and the 2005 Intercreditor Agreement in several respects, and as a consequence, the intercreditor agreement executed in connection with the LBO – which enabled the LBO by purporting to subordinate the Senior Noteholders to $20 billion in new debt, among other things – is invalid and must be disregarded. Specifically, the Indenture provides, among other things, that Basell cannot incur indebtedness under credit facilities above €1.95 billion unless the Senior Notes Indenture is not then in default or rendered in default *and* the new indebtedness meets a specific coverage ratio.  In addition, the Indenture prohibits Basell from granting certain liens securing indebtedness in excess of €1.95 billion unless the Senior Noteholders are granted equal and ratable liens.  Further, the Indenture also requires that any new liens not materially impair the security interests of the Senior Noteholders.

7

7.      The LBO Debt added over $18 billion in net new senior secured indebtedness to Basell's capital structure, which far exceeded the Indenture's €1.95 billion debt and lien limitation.  However, the aforementioned conditions precedent to debt and liens exceeding €1.95 billion were *not* met.  And, since the LBO Debt violated the Senior Notes Indenture, it also violated the express terms of the 2005 Intercreditor Agreement which prohibited refinancings that violated the Indenture and prohibited amendments or restatements of the 2005 Intercreditor Agreement in connection with a transaction that violated the Senior Notes Indenture.  The net result of the LBO Debt was a severe and impermissible subordination of the Senior Notes to the LBO Debt.

8.      On December 20, 2007 – the same date as the incurrence of over $20 billion in LBO Debt to finance the acquisition of Lyondell – LBI and the Bank Defendants, among others, executed and/or consented to a new intercreditor agreement that, among other things, memorialized the Defendants' wrongful subordination of the interests of the Senior Noteholders.  However, because the LBO Debt violated both the terms of the Senior Notes Indenture and the express conditions precedent set forth in the 2005 Intercreditor Agreement for refinancings and the issuance of replacement intercreditor agreements, the Bank Defendants had no right to execute, consent to or rely upon this new agreement and it should be declared null and void as to the Senior Noteholders.  In particular, all bank debt priority provisions in that new intercreditor agreement – including those provisions that purport to subordinate the Senior Notes to the LBO Debt – should be stricken, and declared of no effect, as to the Senior Noteholders.

9.      The Senior Notes and the Senior Notes Indenture were among the most significant obligations of the Basell entities.  LBI and the Bank Defendants were well aware of such

obligations and the limitations they imposed upon LBI, yet structured and consummated the

LBO in violation of the Senior Notes Indenture and in derogation of the rights of the Senior

Noteholders, attempting to "paper over" the failings with a replacement intercreditor agreement

that was not permissible under the existing documents and therefore must be invalidated.  Not

only were the Senior Notes Indenture and the 2005 Intercreditor Agreement breached, but given

the Bank Defendants' knowledge of those agreements (and the rights of the Senior Noteholders

thereunder) and that the LBO was doomed, the Bank Defendants acted inequitably towards the

Senior Noteholders.  This inequitable conduct must affect all debt issued in violation of the

Senior Notes Indenture and the 2005 Intercreditor Agreement.  Accordingly, pursuant to 11

U.S.C. § 510, an order should be issued equitably subordinating all of the claims of the

Defendants against the Debtors in respect of the LBO Debt to the claims of the Senior

Noteholders.

## THE COMMITTEE ACTION

10.     The Committee Action asserts estate causes of action and is separate and distinct

from this Complaint.  This Complaint asserts claims for the benefit of the Senior Noteholders

and addresses the misconduct of LBI and the Bank Defendants against the Senior Noteholders.

The LBO Debt was issued by violating and manipulating binding agreements so as to

subordinate the interests of the Senior Noteholders, thereby rendering the Senior Notes

worthless.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.

12.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1409(a).  The First and Second Causes of Action in this Complaint constitute non-core

proceedings.  The Complaint's Third Cause of Action constitutes a core proceeding pursuant to

28 U.S.C. § 157(b)(2).  This Adversary Proceeding is commenced pursuant to 11 U.S.C. § 510,

28 U.S.C. § 2201 and applicable state law.

## PARTIES

### I.     Plaintiff

13.     Plaintiff Wilmington Trust Company is a corporation organized under the laws of

the State of Delaware with its principal place of business in Wilmington, Delaware.  Plaintiff

commences this action solely in its capacity as successor Indenture Trustee under the Senior

Notes Indenture.

### II.    LBI

14.     Defendant LBI is, upon information and belief, an entity organized under the laws

of Luxembourg.

### III.   The Bank Defendants

15.     Defendant ABN AMRO Bank N.V. ("ABN") is, upon information and belief, a

banking association organized under the laws of the Netherlands.

16.     Defendant ABN AMRO Incorporated is, upon information and belief, a company

organized under the laws of the State of Delaware, with its principal place of business located in

the State of New York.

17.     Defendant Citibank, N.A. is, upon information and belief, a national banking

association with its principal place of business in New York, New York.

18.     Defendant Citibank, N.A., London Branch is, upon information and belief, the London branch of a national banking association with its principal place of business in New York, New York.

19.     Defendant Citibank Global Capital Markets, Inc. is, upon information and belief, a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.

20.     Defendant Goldman is, upon information and belief, a limited partnership organized under the laws of the State of Delaware with its principal place of business in New York, New York.

21.     Defendant Merrill Lynch is, upon information and belief, a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.

22.     Defendant ML Capital is, upon information and belief, a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.

23.     Defendant ML Bank is, upon information and belief, a bank regulated by the Financial Regulator, Ireland.

24.     Defendant UBS AG, Stamford Branch, is, upon information and belief, the Stamford, Connecticut branch of a bank organized under the laws of Switzerland.

25.     Defendant UBS Loan Finance LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York.

26.     Defendant UBS Securities LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York.

## IV.     The Successor Defendants (In Addition To Bank Defendants, Current Holders Of LBO Debt)

27.     Defendant ACLF / Lyondell S.À R.L. is, upon information and belief, a fund managed by Apollo Capital Management L.P.

28.     Defendant ACLF Co-Invest / Lyondell S.À R.L. is, upon information and belief, a fund managed by Apollo Capital Management L.P.

29.     Defendant Apollo Management VII, L.P. is, upon information and belief, a limited partnership organized under the laws of the State of New York, with its principal place of business in New York.

30.     Defendant Ares Management LLC is, upon information and belief, a limited liability company organized under the laws of the State of Texas with its principal place of business in the State of New York.

31.     Defendant Automobile Club Of Southern California Pension Plan is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

32.     Defendant Banc Of America Securities Limited is, upon information and belief, a limited company organized under the Laws of England, acting out of its branch office in London.

33.     Defendant Bayerische Landesbank is, upon information and belief, a banking association organized under the laws of Germany, acting out of its branch office located in the State of New York.

34.     Defendant BDF Limited Partnership is, upon information and belief, a limited partnership organized under the laws of the State of South Carolina with its principal place of business in the State of South Carolina.

35.     Defendant Caterpillar Inc. Pension Master Trust is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

36.     Defendant Central States, Southeast and Southwest Areas Pension Fund is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

37.     Defendant Chrysler LLC Master Retirement Trust is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

38.     Defendant DZ Bank AG is, upon information and belief, a banking institution in Germany.

39.     Defendant Employees' Retirement Fund Of The City Of Dallas is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

40.     Defendant Esperance is, upon information and belief, Esperance Capital, a firm located in New Zealand.

41.     Defendant Field Point IV S.A.R.L. is, upon information and belief, a Luxemburg limited company.

42.     Defendant Field Point V S.A.R.L. is, upon information and belief, a Luxemburg limited company.

43.     Defendant General Board Of Pension And Health Benefits Of The United Methodist Church Inc. in Missouri is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

44.     Defendant GMAM Investment Funds Trust is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

45.     Defendant Goldman Sachs International Bank is, upon information and belief, a banking institution based in London, England.

46.     Defendant Goldman Sachs Lending Partners LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of New York.

47.     Defendant Grand Central Asset Trust, SIL Series is, upon information and belief, an affiliate of Grand Central Funding Corporation, a limited liability company organized under the laws of the State of Delaware.

48.     Defendant Highland Capital Management LP is, upon information and belief, a limited partnership organized under the laws of the State of Delaware with its principal place of business in the State of Texas.

49.     Defendant IBM Personal Pension Plan Trust is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

50.     Defendant International Paper Company Commingled Investment Group Trust is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

51.     Defendant Iowa Public Employees' Retirement System is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

52.     Defendant Jasper Funding is, upon information and belief, an entity affiliated with the Jasper Funds, located in Stanford, Connecticut.

53.     Defendant Kensington International Limited is, upon information and belief, a fund organized under the laws of England.

54.     Defendant Kohlberg Kravis Roberts & Co. (Fixed Income) LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of New York.

55.     Defendant Lerner Enterprises, LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of New York.

56.     Defendant Leveragesource III S.À R.L. is, upon information and belief, a fund managed by Apollo Capital Management L.P.

57.     Defendant Leveragesource XI S.À R.L. is, upon information and belief, a fund managed by Apollo Capital Management L.P.

58.     Defendant Lucent Technologies Inc. Master Pension Trust is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

59.     Defendant Manchester Securities Corp. is, upon information and belief, a corporation organized under the laws of the State of New York with its principal place of business in the State of New York.

60.     Defendant Oak Hill Credit Partners V, Limited is, upon information and belief, a fund affiliated with Oak Hill Capital Partners, L.P. in Forth Worth, Texas.

61.     Defendant Oak Hill European Credit Partners I PLC is, upon information and belief, a fund managed by Oak Hill Capital Partners, L.P. in Forth Worth, Texas.

62.     Defendant Oak Hill European Credit Partners II PLC is, upon information and belief, a fund managed by Oak Hill Capital Partners, L.P. in Forth Worth, Texas.

63.     Defendant OCM High Yield Ld Holdings Ltd. is a fund managed by Oaktree Capital Management, L.P.

64.     Defendant OCM Loan Fund 2x Ld Holdings Ltd. is a fund managed by Oaktree Capital Management, L.P.

65.     Defendant OCM Loan Fund Ld Holdings Ltd. is a fund managed by Oaktree Capital Management, L.P.

66.     Defendant OCM Opportunities Ld Holdings Ltd. is a fund managed by Oaktree Capital Management, L.P.

67.     Defendant OHA Capital Solutions Financing (Offshore), Ltd. is, upon information and belief, an entity affiliated with OHA Capital Solutions, L.P.

68.     Defendant OHA Capital Solutions Financing (Onshore), Ltd. is, upon information and belief, an entity affiliated with OHA Capital Solutions, L.P.

69.     Defendant OHA Finlandia Credit Fund is, upon information and belief, an entity affiliated with OHA Capital Solutions, L.P.

70.     Defendant OHA Strategic Credit Fund (Parallel I), L.P. is, upon information and belief, a limited partnership organized under the laws of the State of Delaware with its principal place of business in the State of New York.

71.     Defendant OHA Strategic Credit Fund, L.P. is, upon information and belief, a limited partnership organized under the laws of the State of Delaware with its principal place of business in the State of New York.

72.     Defendant OHA Strategic Credit Master Fund (Parallel II), L.P. is, upon information and belief, an entity affiliated with OHA Capital Solutions, L.P.

73.     Defendant OHSF Financing, Ltd. is, upon information and belief, a fund affiliated with Oak Hill Capital Partners, L.P. in Forth Worth, Texas.

74.     Defendant OHSF II Financing, Ltd. is, upon information and belief, a fund affiliated with Oak Hill Capital Partners, L.P. in Forth Worth, Texas.

75.     Defendant Pacific Gas & Electric Company Post Retirement Medical Plan Trust for Non-Management Employees and Retirees is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

76.     Defendant PG&E Corporation Retirement Master Trust is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

77.     Defendant Promontoria Holding VI B.V. is, upon information and belief, an affiliate of Cerberus Capital Management, L.P., in New York, New York.

78.     Defendant San Diego County Employees' Retirement Association is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

79.     Defendant Silver Oak Capital LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of New York.

80.     Defendant Silver Point Capital LP is, upon information and belief, a limited partnership organized under the laws of the State of Delaware with its principal place of business in the State of Connecticut.

17

81.     Defendant Silver Point Luxembourg Platform S.A R.L. is, upon information and belief, an affiliate of Silver Point Capital LP.

82.     Defendant SPF CDO I, Ltd. is, upon information and belief, an affiliate of Silver Point Capital LP.

83.     Defendant Springfield Associates, LLC is, upon information and belief, a limited liability company organized under the laws of the State of New York with its principal place of business in New York.

84.     Defendant Stichting Bedrijfstakpensioenfonds Voor De Metalektro is, upon information and belief, organized under the laws of the Netherlands.

85.     Defendant Stichting Mn Services Us High Yield Fonds is, upon information and belief, an affiliate of Stichting Bedrijfstakpensioenfonds Voor De Metalektro.

86.     Defendant Stichting Pensioenfonds Metaal En Techniek is, upon information and belief, an affiliate of Stichting Bedrijfstakpensioenfonds Voor De Metalektro.

87.     Defendant Swiftcurrent Offshore, Ltd. is, upon information and belief, a limited company with its principal place of business in the State of New York.

88.     Defendant Swiftcurrent Partners, L.P. is, upon information and belief, a limited partnership organized under the laws of the State of Delaware with its principal place of business in the State of New York.

89.     Defendant Texas County & District Retirement System is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

90.     Defendant The State Teachers Retirement System Of Ohio is, upon information and belief, a fund managed by Oaktree Capital Management, L.P.

91.      Defendant TMCT II, LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of California.  It is a fund managed by Oaktree Capital Management, L.P.

92.      Defendant TMCT, LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of California.  It is a fund managed by Oaktree Capital Management, L.P.

93.      Defendant W.R. Huff Asset Management Co., L.L.C. is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of New Jersey.

94.      Defendant Western Asset Management Company is, upon information and belief, a corporation organized under the laws of the State of California with its principal place of business in the State of California.

**FACTS**

I.      **Background**

A.      **The Senior Notes Indenture**

95.      On or about August 10, 2005, Basell and certain of its subsidiaries entered into the Senior Notes Indenture with The Bank of New York, as trustee, registrar, paying agent, transfer agent and listing agent (the "Former Trustee"); ABN as security agent; and AIB/BNY Fund Management (Ireland), Limited, as Irish paying agent, under which Basell issued $615 million of dollar-denominated and €500 million of euro-denominated Senior Notes.  The Indenture, and related agreements, provide that the issuer of the Senior Notes will pay interest at a rate of 8-3/8 percent on a semi-annual basis through the Senior Notes' maturity in 2015, and that until the discharge of Basell's liability under the Senior Notes, the Senior Noteholders will

have a security interest in certain specified assets of Basell and guarantees of Basell's obligations under the Senior Notes from all of Basell's restricted subsidiaries.

96.     The Senior Notes Indenture also contains restrictive covenants regarding the incurrence of additional debt and granting of liens by Basell:

(a)     *The Indebtedness Incurrence Restrictive Covenant.*  "Permitted Indebtedness" is defined in the Senior Notes Indenture in pertinent part as "[i]ndebtedness incurred pursuant to [Basell's] Credit Facilities in an aggregate principal amount not exceeding €1.95 billion . . . ."  Because the LBO Debt far exceeded €1.95 billion, Basell was permitted to incur the LBO Debt (but not the liens securing the LBO Debt) under Section 4.12 of the Senior Notes Indenture, entitled "Limitation on Incurrence of Additional Indebtedness," *only if*:  (a) "no Default or Event of Default shall have occurred and be continuing at the time of or as a consequence of the incurrence of such Indebtedness," *and* (b) "if on the date of the incurrence of such Indebtedness, after giving effect to the incurrence thereof, the Consolidated Fixed Charge Coverage Ratio of the Company is greater than 2.0 to 1.0."  The Consolidated Fixed Charge Coverage Ratio ("CFCC Ratio") is defined in the Indenture as the ratio of Basell's consolidated earnings before interest, taxes, depreciation and amortization (as further defined in the Indenture, "EBITDA") to Basell's aggregated interest payments and preferred dividends for the twelve month period through the most recent quarter ending before the incurrence of the indebtedness. Accordingly, in connection with the incurrence of the LBO Debt, the CFCC Ratio is calculated on a *pro forma* basis for the period October 1, 2006 through September 30, 2007 and assumes for this purpose that the LBO Debt was incurred on October 1, 2006.

(b)      *The Lien Incurrence Restrictive Covenant.*  "Permitted Liens" is defined in the Senior Notes Indenture in pertinent part as liens to secure only €1.95 billion in indebtedness under Basell's various credit facilities.  Other than Permitted Liens, Section 4.18 of the Indenture prohibits Basell from granting liens to secure any indebtedness (including guarantees of indebtedness) that is *pari passu* with the Senior Notes, unless the Senior Notes are "secured on an equal and ratable basis with the [new] obligations so secured."   Basell's guarantee of the LBO Debt was *pari passu* with the Senior Notes; thus, any new liens in respect of the LBO Debt also mandated an equal and ratable lien in favor of the Senior Noteholders.

(c)      *The Lien Impairment Restrictive Covenant.*  Section 4.23 of the Senior Notes Indenture provides that Basell can take no action that would result in a material impairment of the security interest in the collateral for the Senior Notes (the "Collateral").  Section 4.23 then expressly provides that Permitted Liens relating to the Collateral and consisting of indebtedness under senior credit facilities in an aggregate amount not exceeding €1.95 billion will not be deemed a material impairment of the Senior Noteholders' security interest.  The LBO Debt was secured by the Collateral in an amount that was many multiples of €1.95 billion, constituting a material impairment of the Collateral.

(d)      *Restrictions On Amending Security Documents.*  Section 4.23 of the Indenture also provides that the security documents governing the Senior Noteholders' interest in the Collateral cannot be, among other things, amended, replaced, supplemented or otherwise modified, subject to certain exceptions not applicable here, unless the Indenture Trustee receives a solvency opinion from an independent financial advisor or an opinion of counsel regarding the validity of any created liens.  Upon information and belief, the LBO Debt resulted in those

security documents being amended, replaced, supplemented or otherwise modified, and yet no such opinions were issued.

### B.    The 2005 Intercreditor Agreement

97.    In connection with the issuance of the Senior Notes, Basell, the Former Trustee, and bank lenders under a €1.95 billion senior facility agreement, entered into the 2005 Intercreditor Agreement on August 1, 2005.

98.    Basell attempted to replace the 2005 Intercreditor Agreement with a purported revised intercreditor agreement in May 2007 (the "May 2007 Intercreditor Agreement"), although, on information and belief, the Senior Noteholders were never informed of any such replacement agreement and did not execute that May 2007 Intercreditor Agreement. Nonetheless, should it be determined that the May 2007 Intercreditor Agreement is the operative agreement, nothing in the May 2007 Intercreditor Agreement would affect the allegations made in this Complaint, other than that many of the references herein to the 2005 Intercreditor Agreement would be amended to be references to the May 2007 Intercreditor Agreement. Plaintiff reserves all of its rights with respect to the May 2007 Intercreditor Agreement. For the purposes of this Complaint, Plaintiff relies on the 2005 Intercreditor Agreement.

99.    Section 37.3 of the 2005 Intercreditor Agreement:  (a) allows Basell's bank debt to be refinanced "in whole or in part on terms *that do not result in a breach of any term of any agreement in respect of Junior Debt [including the Senior Notes Indenture, which is the agreement governing the Senior Notes] . . . ."*  (emphasis added), and (b) provides that any such refinanced bank debt – if and only if such debt complied with the agreements governing Junior Debt (including the Senior Notes Indenture) – would "rank senior to the Junior Debt and otherwise benefit from the provisions of this Agreement on, *mutatis mutandis,* the terms set out

herein. . . ."  New debt incurred in violation of Section 37.3 of the 2005 Intercreditor Agreement

is not entitled to any of the benefits of that agreement (*e.g.*, priority over the Senior Notes).

100.    Moreover, Section 37.4 of the 2005 Intercreditor Agreement, as set forth below,

permits a replacement intercreditor agreement *if and only if*:  (a) the replacement agreement is on

substantially the same terms and conditions as the 2005 Intercreditor Agreement; (b) among

other circumstances not relevant here, the replacement is in connection with a permitted

refinancing of bank debt; and (c) the replacement intercreditor agreement is entered into by,

among other parties, the trustee under the Indenture and the Senior Noteholders:

> 37.4    Replacement Intercreditor Agreement
>
> Following the Interim Facility Discharge Date, subject to being indemnified
> and/or secured to its satisfaction against any fees, costs, expenses or other
> liabilities, which it may in doing so incur, the High Yield Notes Trustee (for itself
> and as trustee for the High Yield Noteholders), *the Junior Creditors [including
> the High Yield Noteholders] and the Obligors shall enter into a replacement
> intercreditor agreement with the Senior Finance Parties and the Hedging Banks
> on substantially the same terms and conditions as the Agreement (mutatis
> mutandis)* on the novation, supplement, refinancing or replacement of all or any
> part of the Senior Debt and do all other acts and things (including, without
> limitation, the execution of assignments or other instruments) as are reasonably
> required and practicable to give effect to the purposes of this Agreement (in the
> case of the High Yield Notes Trustee only, to the extent that such other acts and
> things are not prejudicial to the rights of the High Yield Notes Trustee under this
> Agreement or the High Yield Notes Indenture).

(Emphasis added.)  The "High Yield Notes," as referenced in Section 37.4 of the 2005

Intercreditor Agreement, are the Senior Notes.

## II.    Access And The Bank Defendants Violate The Senior Notes Indenture And The 2005 Intercreditor Agreement

### A.    Background:  Access and Blavatnik

101.    In 1986, Blavatnik founded Access, an international industrial group based in

New York, of which he remains Chairman and President.  Through Access and its affiliates and

in conjunction with joint venturers, Blavatnik accumulated a portfolio of investments in a broad range of basic and advanced industries. His investment portfolio, much of which has been acquired through highly-leveraged transactions, includes stakes in oil, coal, aluminum, petrochemicals and plastics, telecommunications, media and real estate.

102.    On May 5, 2005, Access, through its affiliate Nell Acquisition S.à.r.l. (yet another Blavatnik-controlled entity) acquired Netherlands-based Basell from Royal Dutch Shell plc and the BASF Group. Basell, a Luxembourg limited partnership, was an international chemicals company, self-described as the world's largest manufacturer and marketer of polypropylene and advanced polyolefins, and a major European manufacturer and marketer of polyethylene.

103.    In August 2005, the Senior Notes were issued on terms that protected the Senior Noteholders from any excess incurrences of debt in the future. However, as alleged in the Committee Action, within a year, Blavatnik, through Access, had set his sights on an acquisition of Lyondell, and within two years he had agreed both to pay an exorbitant price for Lyondell and, in order to finance this acquisition, to burden Basell with a massive amount of new debt, which caused the breach of the Senior Notes Indenture and the 2005 Intercreditor Agreement.

### B.    Access Forces Basell To Bid $48 A Share For Lyondell

104.    As the Committee Action alleges:  (a) in December 2007 – on the eve of an anticipated downturn in Lyondell's principal businesses, energy and refining – Access forced Basell to pay $48 a share for Lyondell's common stock in an acquisition agreement without a condition precedent regarding available financing; (b) the acquisition of Lyondell was financed entirely with debt, and (c) little more than a year earlier, in the summer of 2006, Basell had offered no more than $28.50 a share for the same company, and Blavatnik had stated that a "non-stupid" price for Lyondell had to be below $30 a share.

105.    However, as the Committee Action furthers alleges:  (a) Blavatnik was willing to pay the exorbitant $48 a share price because he was not required to invest any additional money to fund the transaction and Basell was able to obtain debt financing for 100 percent of the money required to fund the transaction; and (b) Blavatnik and Access were major beneficiaries of this price since Blavatnik had, prior to the Lyondell acquisition, acquired rights to nearly 10 percent of Lyondell's stock through an Access affiliate.  In fact, upon the occurrence of the Lyondell acquisition:  (a) Blavatnik netted a windfall profit in excess of $333 million through a Blavatnik-controlled entity named Nell Limited, organized under the laws of Gibraltar, a tax haven; and (b) that same entity, Nell Limited, also received a $100 million "one time" transaction advisory fee upon the acquisition plus a $25 million "management" fee – all purportedly tax-free.  Thus, as a result of Basell's acquisition of Lyondell, Blavatnik made over $450 million in a single day, as is alleged in the Committee Action.

106.    Upon information and belief, other than the self-serving valuations by Basell's investment banker, Merrill Lynch, no financial analysis supported this enormous $48 a share price tag for Lyondell.  Indeed, as the Committee action alleges, analyses in earlier June 2007 by Merrill Lynch showed that a highly leveraged combined Basell/Lyondell enterprise made no economic sense when viewed from its "base case" projections; only if Merrill Lynch's "upside case" was accepted, with its purported merger "synergies," did the transaction look like it even possibly made sense.  Conveniently, five days later, Merrill Lynch modified its analysis to make the acquisition look better even at the "base case."

### C.    The Bank Defendants' Role

107.    The acquisition of Lyondell could never have been undertaken without the Bank Defendants improperly facilitating the transaction.  As the Committee Action alleges, in their

haste to consummate a deal, Citigroup, Merrill and Goldman, as the lead banks on the LBO

Debt:  (a) failed to conduct any proper due diligence on Lyondell management's projections for

revenues and EBITDA, and (b) approved their role in the financing based largely on the over

$250 million in syndication fees they stood to make.

108.    As the Committee's allegations also provide:

(a)    Merrill's Debt Markets Commitment Committee approved the Lyondell

acquisition on July 15, 2007, noting that Merrill stood to make at least $86.2 million in net

financing fees on the deal, assuming syndication of the LBO Debt.  When combined with Merrill

Lynch's anticipated fee as lead advisor on the deal (which in the end was over $31 million),

Merrill stood to make well over $100 million on the acquisition.  Further, Merrill assumed, in its

internal July 15, 2007 report, that it would be able to quickly "dump" virtually all its exposure

through syndication, and planned to keep only $100 million of debt.  With this view towards

unloading their debt in any event, the failure to determine the harm of the proposed transaction to

those creditors left behind smacked of bad faith.

(b)    Citigroup also approved its participation in the financing on July 15, 2007,

even though it noted in its Commitment Committee Approval Memorandum ("CCA Memo") the

same risks (*e.g.,* "industry cyclicality" and "rising raw materials and energy prices") that made the

extreme leverage so inappropriate to the needs of the combined entities.  Citigroup's CCA Memo

also modeled a potential downside scenario, which in fact closely tracked what actually occurred

for LBI during the balance of 2007.  Nonetheless, the CCA Memo underscored the huge fees that

Citigroup had made and was scheduled to make on other Basell deals.  When a Citigroup team

member commented, in an internal email late on July 15, 2007, that Lyondell's "EBITDA

numbers are pretty frothy" and questioned the Lyondell management projections and assumptions, one of the lead Citigroup team members responded: "Understand. It[']s Basell management that really bought off on it." In other words, Citigroup's banking team was prepared to do the deal simply because Blavatnik wanted to do the deal and, Citigroup assumed, as did the other lead banks, that it could off load the LBO Debt (and the associated economic risk) through syndication.

(c)      Goldman's approach was similar. Eager to get a role in financing the Lyondell transaction, Goldman's Capital Credit Committee ("CC Committee") approved Goldman's participation in the LBO Debt even though Goldman's initial July 16, 2007 CC Committee memorandum noted that the Goldman team had only a single day to meet with Lyondell management with the "updated business plan and access to legal and full business diligence." Even in its haste, the CC Committee described the very same risk factors that LBI management would later contend unforeseeably converged to drive the combined companies aground only months later, including an anticipated industry downturn, dependence on volatile commodities markets and declining demand. Goldman's analysts also foresaw that the Lyondell acquisition would result in Basell's credit rating being downgraded at least one, if not two "notches," reflecting the risks associated with the financing structure. Goldman nonetheless leapt at the opportunity to be one of the three original lead banks on the deal, confident it could syndicate its $7 billion commitment. However, when assessing whether Goldman should hold onto any part of the LBO Debt, the CC Committee was clear: based on "fundamental credit considerations," Goldman should retain only a "strategic hold" of "up to" €10 million in principal amount of the most secure part of the loans (*i.e.*, the first lien loans) and should eliminate all other holdings "to zero within six months."

109.    On July 16, 2007, Citigroup, Goldman and Merrill sent Basell a commitment letter (the "Commitment Letter") for the over $20 billion in financing necessary for the acquisition of Lyondell.  Pursuant to the Commitment Letter, the three lead banks committed to fund up to $14 billion of first lien secured credit facilities, including a $13 billion term loan, and up to $7 billion of second lien loans pursuant to a bridge facility.  Basell, at its option and in lieu of the bridge facility, could issue up to $7 billion in principal amount of second lien notes and/or senior unsecured notes (at the option of the banks) in a private debt offering.  Citigroup, Goldman and Merrill were appointed as joint lead arrangers, bookrunners, and global coordinators for the first lien credit facilities.  ABN AMRO joined as a lead arranger in August 2007, and UBS joined as a lead arranger in October 2007.

110.    The Bank Defendants, blinded by their anticipated fee income, forged ahead, structuring a reckless debt package that:  (a) could not be supported by the combined companies, and (b) was in direct violation of the rights of the Senior Noteholders under the Senior Notes Indenture.

### D.    The Ramifications Of The LBO Debt

111.    Defendants Citigroup, Goldman and Merrill (as well as ABN AMRO and UBS), were parties, along with LBI and certain of its subsidiaries (collectively, "LBI"), to one or more of the documents memorializing the LBO Debt, including:  (a) the credit agreement dated as of December 20, 2007; (b) the bridge loan agreement dated as of December 20, 2007; and (c) the $1,000,000,000 credit agreement dated as of December 20, 2007 (collectively, the "Credit Agreements").  These Credit Agreements represented a maximum of $22.6 billion of bank debt financing for the Lyondell acquisition, of which approximately $2 billion was unfunded at closing.

112.    Further, the Bank Defendants, among other lenders, were also parties to, or agreed to be bound by (directly or through an affiliate), a new intercreditor agreement dated December 20, 2007 (the "December 2007 Intercreditor Agreement"), intended to replace the then existing intercreditor agreement, and subordinate the Senior Notes to $20 billion of the new LBO Debt.

113.    The Credit Agreements and the December 2007 Intercreditor Agreement violated the Senior Notes Indenture and 2005 Intercreditor Agreement in several respects, including but not limited to:

### 1.    The LBO Debt Violated The Indenture's Indebtedness Incurrence Restrictive Covenant

114.    The +$20 billion of LBO Debt violated the terms of Section 4.12 of the Senior Notes Indenture.  Under Section 4.12, the LBO Debt was permissible only if, on the date such indebtedness was incurred (and after giving effect to the incurrence of such indebtedness), "no Default or Event of Default shall have occurred and be continuing" and the CFCC Ratio was "greater than 2.0 to 1.0."  On the date the LBO Debt was incurred, "Defaults" did exist under the terms of the Indenture, including, among others, the excessive liens granted to the holders of the LBO Debt in violation of Section 4.18 of the Indenture (see below).  Furthermore, the debt incurred could not satisfy Section 4.12's coverage test (CFCC Ratio of more than two to one) using a calculation of Basell's *pro forma* EBITDA and interest expense (as provided in the Indenture).

### 2.    The LBO Debt Violated The Indenture's Lien Incurrence Restrictive Covenant

115.    The liens granted by Basell to the LBO Lenders to secure its guarantees of the +$20 billion in LBO Debt violated the Indenture's Permitted Liens provision.  Accordingly, under Section 4.18 of the Indenture, the Senior Noteholders, as *pari passu* creditors, were

entitled to, but did not receive, liens "secured on an equal and ratable basis with the [new]

obligations so secured. . . ."

### 3. The LBO Debt Violated The Indenture's Lien Impairment Restrictive Covenant

116.     The liens that Basell granted to the LBO Lenders on the Collateral (which also

secured the Senior Notes) violated Section 4.23 of the Senior Notes Indenture because the LBO

Debt secured by such liens, in vastly exceeding the amounts provided for in Section 4.18 of the

Senior Notes Indenture, materially impaired the security interests of the Senior Noteholders.

Section 4.23 of the Indenture expressly provides that Permitted Liens not exceeding €1.95 billion

would not be deemed a material impairment of the Senior Noteholders' security interest;

certainly, an additional $20 billion in senior liens on the Collateral securing the Senior Notes

"materially impaired" the Senior Notes' lien.

### 4. The LBO Debt Violated The Indenture's Restrictions On Amending Security Documents

117.     Section 4.23 also provides that the security documents for the Senior Noteholders'

Collateral cannot be, among other things, amended, replaced, supplemented or otherwise

modified, subject to certain exceptions, unless the trustee under the Indenture receives a required

solvency opinion or an opinion of counsel.  Upon information and belief, although the incurrence

of the LBO Debt and the execution of the December 2007 Intercreditor Agreement resulted in

one or more modifications of these security documents, no such opinion was issued to the

Former Trustee.

### 5. The LBO Debt Violated The 2005 Intercreditor Agreement

118.     By violating several terms of the Senior Notes Indenture, the LBO Debt also did

not satisfy, but rather breached, Section 37.3 of the 2005 Intercreditor Agreement, which allowed

refinancings of Basell's credit facilities only where those refinancings did not violate, among other prior agreements, the Indenture.

119.    The 2005 Intercreditor Agreement was further breached because the December 2007 Intercreditor Agreement was not substantially similar to the 2005 Intercreditor Agreement, as required by Section 37.4 of the 2005 Intercreditor Agreement.  Section 17.1 of the 2005 Intercreditor Agreement, governing the ranking of security interest, was substantially modified by the December 2007 Intercreditor Agreement such that the security documents covering the Collateral also then secured on a first ranking basis the LBO Debt.  In addition, fundamental provisions relating to governing law and the jurisdiction for the adjudication of disputes were changed (from England to New York on both counts).  Many other provisions of the 2005 Intercreditor Agreement were deleted or modified and new provisions were added in an attempt to accommodate the LBO Debt, the new lenders and the new liens in December 2007.

120.    Further, Section 37.4 of the 2005 Intercreditor Agreement provides that the Senior Noteholders were to be parties to any replacement intercreditor agreement, and yet they were not.

121.    Because of these violations of the Senior Notes Indenture and the 2005 Intercreditor Agreement, the conditions precedent to entry of  the December 2007 Intercreditor Agreement were not met.  Because the conditions were not met, the December 2007 Intercreditor Agreement could not be properly executed and is not enforceable.

122.    Defendants ABN and ML Capital (the "2005 Bank Defendants") were parties to the 2005 Intercreditor Agreement and the December 2007 Intercreditor Agreement.  The Bank Defendants were parties to, or lenders that agreed to be bound by, the December 2007

Intercreditor Agreement, and, upon information and belief, assented to that agreement with

knowledge that it violated both the 2005 Intercreditor Agreement and the Senior Notes

Indenture.

### FIRST CAUSE OF ACTION

### Declaratory Judgment

### (Against LBI and the Bank Defendants)

123.    Plaintiff incorporates by reference all of the preceding allegations of this

Complaint as though set forth fully herein.

124.    A justiciable case and controversy exists among Plaintiff, as the trustee for the

Senior Noteholders under the Indenture, and LBI and the Bank Defendants with respect to the

validity of the December 2007 Intercreditor Agreement.

125.    LBI and the Bank Defendants were parties to, or lenders that agreed to be bound

by, the December 2007 Intercreditor Agreement.

126.    LBI and the Bank Defendants, by agreeing to the LBO Debt, and/or entering into,

among other agreements, the Credit Agreements and the December 2007 Intercreditor

Agreement, failed to abide by the express conditions precedent set forth in Sections 37.3 and

37.4 of the 2005 Intercreditor Agreement for refinancings and the execution of replacement

intercreditor agreements.

127.    Accordingly, LBI and the Bank Defendants were not permitted to execute or

otherwise agree to the December 2007 Intercreditor Agreement, or to attempt in any way to

subordinate the Senior Noteholders to the interest of the institutions that funded the LBO Debt.

Thus, this Court should issue an order pursuant to 28 U.S.C. § 2201 declaring that the December

2007 Intercreditor Agreement is null and void, and that its subordination provisions are of no effect, as to the Senior Noteholders.

## SECOND CAUSE OF ACTION

### Breach of Contract (Damages)

### (Against the 2005 Bank Defendants)

128.    Plaintiff incorporates by reference all of the preceding allegations of this Complaint as though set forth fully herein.

129.    The 2005 Bank Defendants were signatories to the 2005 Intercreditor Agreement and the December 2007 Intercreditor Agreement.

130.    The 2005 Bank Defendants, by agreeing to the LBO Debt, and entering into, among other agreements, the Credit Agreements and the December 2007 Intercreditor Agreement, breached the express conditions precedent in the 2005 Intercreditor Agreement and violated the rights of the Senior Noteholders thereunder.  Under Sections 37.3 and 37.4 of the 2005 Intercreditor Agreement, the 2005 Bank Defendants were precluded from refinancing senior debt with the LBO Debt and from entering into any replacement intercreditor agreement in connection therewith.

131.    The Senior Noteholders have suffered significant losses as a result of the 2005 Bank Defendants' breaches of the 2005 Intercreditor Agreement, and Plaintiff is entitled to recover from the 2005 Bank Defendants damages for those losses, the amount of which will be determined at trial.

### THIRD CAUSE OF ACTION

### Equitable Subordination

### (Against the Defendants)

132.     Plaintiff incorporates by reference all of the preceding allegations of this Complaint as though set forth fully herein.

133.     The conduct of the Bank Defendants, as alleged above, constituted inequitable conduct directed at the Senior Noteholders separate and apart from the harm they may have visited on the Debtors or other creditors of the Debtors.  The Bank Defendants intentionally agreed to or entered into agreements that purport to subordinate the Senior Noteholders' interest to that of the holders of the LBO Debt with full knowledge of, and in violation of, the Senior Notes Indenture and the 2005 Intercreditor Agreement, and thereby allocated the significant risks of the Lyondell acquisition to Senior Noteholders.  Given that the Bank Defendants' conduct was directed specifically at Senior Noteholders, the Debtors' estate does not own or otherwise possess the equitable subordination claim asserted in this cause of action.

134.     By reason of the conduct of the Bank Defendants, the Senior Notes have been wrongfully subordinated to +$20 billion of debt, thereby rendering those Senior Notes worthless and harming the Senior Noteholders individually and specifically.

135.     Allowing the Bank Defendants (and the Successor Defendants, as assignees from the Bank Defendants of the LBO Debt) to receive payment on their claims in respect of the LBO Debt against the Debtors, which they purport to assert prior to the Senior Noteholders' claims against the Debtors, would be unfair and inequitable.

136.    Equitable subordination of the claims of the Defendants in respect of the LBO

Debt, where as here they (or their predecessors in interest) have engaged in inequitable conduct

directed at a specified set of creditors, is consistent with the Bankruptcy Code.

137.    Because of the transactions and actions described herein, the Defendants' claims

in respect of the LBO Debt against the Debtors should be equitably subordinated to the claims of

the Senior Noteholders pursuant to 11 U.S.C. § 510(c).

## PRAYER FOR RELIEF

WHEREFORE, judgment should be entered in favor of Plaintiff and against the

Defendants as follows:

(a)    On the first cause of action, entry of an order declaring that the December 2007

Intercreditor Agreement is null and void, and the LBO Debt priority provisions of that

Agreement of no effect, as to Senior Noteholders;

(b)    On the second cause of action, awarding damages against the 2005 Bank

Defendants and to Plaintiff in an amount to be determined at trial;

(c)    On the third cause of action, an order equitably subordinating the claims of the

Defendants in respect of the LBO Debt against the Debtors to those of Senior Noteholders;

(d)    An award to Plaintiff of the costs and disbursements of this action, including

reasonable attorneys' fees; and

(e)    Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
         October 1, 2009

Respectfully submitted,

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP


By /s/ David S. Rosner
    David S. Rosner
    Michael M. Fay
    Andrew K. Glenn
    David J. Mark
    Daniel A. Fliman
    1633 Broadway
    New York, NY 10019
    (212) 506-1700

Attorneys for Plaintiff Wilmington Trust Company,
solely in its capacity as Successor Trustee


KLESTADT & WINTERS LLP


By /s/ Tracy L. Klestadt
    Tracy L. Klestadt
    292 Madison Avenue, 17th Floor
    New York, NY 10017
    (212) 972-3000
    Conflicts Attorneys for Plaintiff Wilmington
    Trust Company, solely in its capacity as
    Successor Trustee as to the following
    defendants: APOLLO MANAGEMENT VII,
    L.P., LERNER ENTERPRISES, LLC, OAK
    HILL CREDIT PARTNERS V, LIMITED,
    OAK HILL EUROPEAN CREDIT
    PARTNERS I PLC, OAK HILL
  EUROPEAN CREDIT PARTNERS II PLC,
   OCM HIGH YIELD LD HOLDINGS LTD.,
   OCM LOAN FUND 2X LD HOLDINGS LTD.,
   OCM LOAN FUND LD HOLDINGS LTD.,
   OCM OPPORTUNITIES LD HOLDINGS
   LTD, SILVER OAK CAPITAL LLC, SILVER
   POINT CAPITAL, SILVER POINT
   LUXEMBOURG PLATFORM S.A R.L.